## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| JUSTIN GARVIN, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | |
| SOUTHWESTERN CORRECTIONAL, L.L.C.; | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Justin Garvin files this Original Complaint to complain of Southwestern Correctional, L.L.C. dba LaSalle Corrections, LLC (hereinafter referred to as "LaSalle" or "Defendant"), and would respectfully show the Court as follows:

## I. NATURE OF THE ACTION

1.1.    Plaintiff files this Complaint alleging wrongful termination based on gender discrimination, retaliation, sexually hostile work environment, and wrongful termination. Plaintiff seeks reinstatement to his former job duties, as well as damages for wrongful termination.

## II. PARTIES

2.1.    Plaintiff Justin Garvin (hereinafter "Garvin" or "Plaintiff") is an individual and a resident of Johnson County, Texas, and he worked out of the Defendant Southwestern Correctional, L.L.C.'s office in Cleburne located in Johnson County, Texas.

1

2.2.    At all relevant times, Southwestern Correctional, L.L.C. was and is a Texas entity that has a central office in Ruston, Louisiana.  Southwestern Correctional, L.L.C. also operates in Texas under the assumed name of LaSalle Southwest Corrections and its assumed name is active in all counties of Texas from June 2, 2010 through June 2, 2020.  Southwestern Correctional, L.L.C. also operates in Texas under the assumed name of LaSalle Corrections, LLC and its assumed name is active in all counties of Texas from September 12, 2011 through September 12, 2021.  Process may be served on Southwestern Correctional, L.L.C. by serving its registered agent, Tim Kurpiewski, located at 26228 Ranch Road 12, Dripping Springs, Texas 78620.

2.3.    At all relevant times of the claims of discrimination, Defendant employed over 50 employees.  Also, at all relevant times, Defendant has continuously been an employer engaged in an industry affecting commerce within the meaning of which incorporates by reference Sections 701(g) and (h) of Title VII, 42 U.S.C. §§ 2000e(g) and (h).

### III.    JURISDICTION AND VENUE AND DISCOVERY

3.1.    Pursuant to 28 U.S.C. § 1331, jurisdiction lies in the United States District Court for the Northern District of Texas as this action involves a question of the application of federal law, including gender discrimination and retaliation under 42 U.S.C. § 1981

3.2    Venue for all causes of action stated herein lies in the Northern District of Texas because the acts alleged in this Complaint took place, in whole or in part, within the boundaries of this District pursuant to 28 U.S.C. § 1391.

3.3.    Plaintiff has satisfied all procedural pre-requisites to filing this lawsuit, including the filing of a charge with the United States Equal Employment Opportunity Commission, for itself and as receiving agent for the Texas Commission on Human Rights. The Equal Employment Opportunity Commission ("EEOC") has issued Plaintiff a Right to Sue Letter.

Attached hereto and incorporated herein as though fully set forth at length are the following documents: "Exhibit A." Plaintiff's Right to Sue Notice.

3.4.    Exhibit A demonstrates that Plaintiff asserted a complaint administratively with the EEOC and that the EEOC resolved Plaintiff's complaint to fruition by providing him with a "Right to Sue". *See, e.g., Shepard v. Longhorn Pipeline Partners*, LP 534 F. Supp. 2d. 838, 840 (W.D. Tex. 2007).

## IV.    FACTUAL BACKGROUND

4.1.    Justin Garvin excelled in the position he held with Defendant LaSalle since 2012 in the transport division where he was last managed and supervised by Sergeant Jeremey Arbuthnot ("Arbuthnot").

4.2.    Not long after he began his employment with Defendant LaSalle, Garvin witnessed Defendant LaSalle, specifically Warden Eddie Williams ("Williams"), treating female LaSalle employees better than the similarly situated male employees. For example, female employees similarly situated to Garvin were paid higher wages than Garvin and his male colleagues. A male licensed jailer who stood at six-feet, eight-inches with experience as a licensed jailer received a wage of $11 per hour while a newly hired female employee, small in stature, and with zero experience was paid $11.50 per hour.

4.3.    In or around April 2015, as Garvin was concerned about the obvious discrepancy in wages and associated favoritism, Garvin inquired with other LaSalle employees to determine if there was a pattern of LaSalle paying Garvin's more experienced male co-workers less than the similarly situated female employees. Garvin's supervisor, Sergeant Arbuthnot, called Garvin while he was off-duty and at home, and threatened him for discussing LaSalle's wages. In his phone call, Arbuthnot told Garvin that he was heard discussing salaries at the courthouse earlier

in the day, and that "there would be consequences" if he kept it up. Garvin informed Arbuthnot of a new federal law that allowed federal workers, including workers who were employed as sub-contractors such as Garvin to openly discuss wages and earnings while at their place of work. Mr. Garvin told Arbuthnot that because of the law, his conversations regarding wages were legal. Arbuthnot concluded by telling Mr. Garvin that Warden Williams wanted him to "keep his mouth shut."

4.4.    Not only was Mr. Garvin verbally reprimanded for inquiring as to why female employees were paid more than male employees with equal or more experience, he was also subjected to a hostile work environment and retaliated against by female employees and his supervisors.

4.5.    For example, Garvin, who has a receding hairline and bald spot, was often made fun of by Major Judith Bennett ("Bennett") throughout his career at LaSalle. Bennett would often say, "why don't you just cut it all off," and other demeaning comments in front of fellow employees and even county inmates, undermining Garvin's authority. When Garvin would ask Bennett to stop making fun of him, she would respond, "It's funny, Garvin." Bennett's comments and actions were so demeaning that eventually, Garvin complained to his superiors Regional Transport Supervisor Randy Woolley ("Woolley") and Arbuthnot, but they took no action to investigate or stop Bennett's adverse treatment of Garvin. His supervisors were his only resource to complain about the harassment because LaSalle did not have an onsite human resource contact or department at the facility where Garvin worked.

### Pervasive and Consistent Harassment and Hostile Work Environment

4.6.    Garvin was often partnered with fellow Transport Officer Diana Berend ("Berend") who often called Warden Williams "Daddy" and would often discuss her breasts in

front of Garvin. Berend appeared to have a special relationship with Warden Williams, whom she spoke with in an unprofessional manner in the presence of Garvin and other Company employees. Berend informed Garvin on several occasions that if Warden Williams' wife knew that the two worked together, his wife would divorce him. Berend is also married to Major Gary Berend, who works at a different LaSalle-managed facility.

4.7.    It was a common belief among Garvin and other LaSalle employees that Berend and Warden Williams had a sexual relationship. This resulted in the eventual disparate treatment and retaliation of Garvin because he complained about Berend speaking so sexually in front of him. Berend would brag to other employees such as Garvin that she was "moving up and Eddie is taking me places." Berend would often tell Garvin, who is 6-feet, four-inches tall and 300-pounds, that he was "too fat" to work on I.C.E detail at the courthouse. This is significant as Warden Williams gave Berend a higher hourly pay rate compared to Garvin, even though Berend is significantly less qualified and experienced than Mr. Garvin. Astonishingly, the Warden also assigned her the title of "Officer-in-Charge" for I.C.E duty at the courthouse, despite her lack of experience and qualifications as compared to most other employees.  Berend would brag to Garvin and other employees that she was making more money. Both Mr. Garvin and Berend were supervised by Sergeant Arbuthnot, who allowed Berend to pick whatever duties and details she wanted so that Warden Williams would not discipline or otherwise disfavor him. This greatly affected Garvin's workplace environment.

4.8.    In May 2016, soon after leaving the Company's Johnson County facility to begin their day, Berend spoke openly to Garvin about her breasts and how she had them "lifted" and now they needed to be "refreshed." Garvin conveyed to Berend that referencing her breasts in conversation made him uncomfortable as it was inappropriate at work.  Berend then increased

her flirtations with Garvin stating that Garvin actually liked the topic and was just being shy. However, Garvin again repeated that her comments were inappropriate, he was not interested in her, and her comments made him uncomfortable, but Berend did not stop her comments.

4.9.    Later, on the same day, Garvin and Berend were transporting a number of inmates from the Dallas Field Office ("DFO") to the Bedford jail. During this van ride Berend was engaged in a phone call lasting approximately thirty minutes with Warden Williams. The phone call was mostly of a personal nature. When Berend concluded the phone call she told Garvin not to say anything to anyone about the conversation. Garvin told Berend that these types of phone calls with the Warden made him extremely uncomfortable because ultimately, Warden Williams was his boss. In response, Berend told Garvin he needed to "lighten up."

4.10.    The following day, Garvin complained to both Woolley and Artbuthnot about the inappropriate conversations, but neither supervisor took any action, as they ultimately answered to Warden Williams who had oversight of the Johnson County Correctional facility.

4.11.    Only one (1) day after Garvin complained about Berend's behavior, Garvin was orally reprimanded by Warden Williams. In that oral reprimand, Warden Williams told Garvin to follow him to the Warden's truck during work hours. Once inside the truck, Warden Williams reprimanded Garvin for talking to a Major's wife (Berend), in the manner which he allegedly spoke to her, for example by stating that her comments made Garvin uncomfortable. The Warden also told Mr. Garvin that he was "in the wrong." Warden Williams concluded by telling Garvin, "You're not going to say anything about this to anybody. You're going to keep your mouth shut and mind your own business."

4.12.    Then only two (2) weeks after this incident, Garvin was removed, without cause, by Warden Williams from his assignment, which was a federal detail under the U.S. Immigration

and Customs Enforcement (I.C.E.). This materially affected Mr. Garvin's pay as the I.C.E. duty paid $16.54 per hour compared to the $10.50 per hour for normal pay which Garvin was paid henceforth. Mr. Garvin was given the excuse by his Supervisors, Randy Woolley and Arbuthnot that someone on his team had allegedly complained about Garvin, saying that he was "slacking" on the job. In an attempt legitimize the bogus complaint against Garvin, Arbuthnot asked Garvin to pick someone on his team he could trust. After Garvin referenced Transport Officer Dan Finley ("Finley"), he was dismissed, and Finley was interviewed for a very short time in the office by Woolley and Arbuthnot. Shortly thereafter, Woolley and Arbuthnot told Garvin that Finley had complained about him. However, in a subsequent conversation between Garvin and Finley, it was revealed that Finley did not complain to Woolley and Arbuthnot in the meeting about anything, especially not Garvin.   Finley's interview, allegedly about Garvin, that took place subsequent to the adverse action and demotion in pay, was clearly pretextual in nature.

4.13.   Garvin's Regional Transport Supervisor Randy Woolley told Garvin that Warden Williams had instructed him and Sergeant Jeremy Arbuthnot to figure out a way to remove Garvin from the I.C.E. assignment. The scheme to create false complaints was part of a plan to terminate Mr. Garvin, or to force him to quit.

4.14.   In February 2017, Garvin was instructed by his supervisors, Woolley and Arbuthnot that he could no longer go to the Company's Dallas Field Office ("DFO"). To his knowledge, Garvin was the only similarly situated LaSalle employee who was forbidden from going to the DFO. Realizing that he was being singled-out by this exclusion, Garvin inquired with a ranking I.C.E. agent who would have knowledge as to the legitimacy of this claim. Garvin's contact investigated the claims, inquiring with agents at the DFO, who informed him that Garvin was not on any list or otherwise under any action which might exclude him from

working on an I.C.E. detail at the DFO. Thus, Garvin was given a false explanation by LaSalle and its supervisors in order to retaliate against Garvin. As a result, Garvin was unable to receive pay pursuant to I.C.E. duty. Even though he possessed a federally issued Department of Homeland Security I.C.E. identification badge, Garvin was denied the ability to use it and to fully take advantage of its employment privileges as has been enjoyed by other LaSalle transport officers.

4.15.    Proximate in time to being told he could no longer go to the DFO, Mr. Garvin was assigned the task of transporting detainees to Dallas Fort Worth airport. However, Garvin's assignments to take detainees to the airport were abruptly halted without explanation. He was the only Transport Officer who was removed from this duty. This appeared to be an increasing effort to force Mr. Garvin to resign from the Company. However, Garvin refused to quit, and a more intense pattern of harassment and retaliation began against our him.

**Constructive Termination**

4.16.    On or about May 10, 2017, Garvin was returning from lunch break to the LaSalle facility via Kilpatrick Street with his partner Penny Fowler ("Fowler"), and Officers Sullivan and Henry. At the same time, Warden Williams, Assistant Warden Johnson, Major Judith Bennett, and Captain Gray were exciting a vehicle. Upon driving into the parking lot, passenger Garvin removed his seatbelt.

4.17.    As the vehicle carrying Garvin pulled into the parking lot, Warden Williams, Assistant Warden Johnson, Major Judith Bennett, and Captain Gray stared at the officers intensely as if they wanted their attention. Garvin advised the driver of the vehicle, Penny Fowler, to pull over, and Garvin rolled down his window and asked if they needed anything. Immediately thereafter, Major Bennett proceeded to yell at Garvin for not wearing his seatbelt.

Garvin tried to explain that he had just taken it off after they entered the parking lot and were parking, but Major Bennett insisted that the vehicle was still on the roadway.

4.18.    Shortly thereafter, Garvin joined his partner Fowler and officer Henry in retrieving an inmate for delivery to county court. Approximately thirty minutes later, when Garvin returned to the transport van, RTS Woolley and Officer Sullivan were waiting for Garvin. At this time RTS Woolley informed Garvin that he was being relieved from his assignment by Officer Sullivan and would be reassigned to "shift duty." Garvin was told to immediately turn in his Transportation Officer equipment and report to the lieutenant in charge of shift duty for his assignment.

4.19.    Under LaSalle protocol and its common practice, in the rare instance where the Company reassigned a Transport Officer to shift duty, there was a process that was followed. Reassignment occurred as a disciplinary measure against employees who were consistently late for work, or who had received numerous complaints from the county courthouse. None of these instances applied to Garvin. In addition, the reassignments would be for a term of 60-90 days. Garvin had not received any write-ups in the previous three (3) years of his employment. Garvin was denied any sort of investigatory process and was reassigned to shift duty without explanation and without any sort of improvement plan. This was evidently a pretext for retaliation and discrimination.

4.20.    In an effort to understand why he was being removed from the more lucrative I.C.E. detail and being placed on "shift" duty, Garvin attempted to contact Warden Williams. However, the Warden refused to return any of Garvin's inquiries. With his removal to shift duty, Garvin would have been forced into one of the lower paying jobs at LaSalle, and this demotion would have been a complete change from his Transport Officer position which he had held

during the course of his employment with LaSalle. As a result, any seniority in terms of wages he enjoyed as a Transport Officer would be taken from him and he would be considered a "new boot" with no seniority. As such, he would not have the opportunity to make an amount of pay equal to that which he was earning as a Transport Officer, and there was no chance that he would earn a significant pay increase to return him to that level.

4.21.   On or about May 11, 2017, Garvin was told that he must report for shift duty. Due to the continuing harassment which resulted in his demotion and approaching loss in pay and LaSalle's refusal to investigate his complaints of discrimination, retaliation and harassment, Garvin was left with no choice but to resign from his position with LaSalle.

## V.   CAUSES OF ACTION

**COUNT I:**   **Gender Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq.**

5.1.   Plaintiff realleges and incorporates by reference all allegations set forth in all of the above paragraphs of this complaint.

5.2.   The foregoing conduct violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., which makes discrimination against employees on the basis of sex illegal.

5.3.   During Defendant's discrimination, Plaintiff was subject to comments and actions made against him on the basis of his gender.

5.4.   Plaintiff's work environment was negatively impacted soon after he began to openly question why some female employees were being treated differently, and paid better, then similarly situated male employees such as himself. He was often picked on and ridiculed by female co-workers and at least one female supervisor.

5.5.    In April 2015, Plaintiff's immediate supervisor, Arbuthnot, threatened Plaintiff for discussing the Defendant's wages, and he further informed Plaintiff that Warden Williams wanted him to "keep his mouth shut."

5.6.    Despite having the same Transport Officer duties, Plaintiff was denied any I.C.E. duty at the courthouse. This was given only to a female Transport Officer: Diana Berend. As a result, Berend would often tell Plaintiff that he was "too fat" to work on I.C.E detail at the courthouse. Additionally, Warden Williams gave Berend a higher hourly pay rate compared to Plaintiff.

5.7.    In addition, Mr. Garvin was subjected to the following treatment:

(1) Plaintiff was continuously ridiculed by Major Judith Bennett throughout his career at LaSalle for having a bald spot. Bennett would often say, "why don't you just cut it all off," and other demeaning comments in front of fellow employees and even county inmates, undermining Plaintiff's authority;

(2) In May 2016, Plaintiff complained that co-worker Berend repeatedly referenced her breasts in conversation and that Berend had inappropriate phone conversations with Warden Williams while partnered, and on duty with Plaintiff. As a result of his complaint, Warden Williams told Plaintiff that he was "in the wrong," and that, "You're not going to say anything about this to anybody. You're going to keep your mouth shut and mind your own business;"

(3) In February 2017, Plaintiff was instructed by his supervisors, Woolley and Arbuthnot that he could no longer go to the Company's Dallas Field Office ("DFO"). There was no reason given for this exclusion, and no other Transport Officer was excluded from the DFO;

(4) On or about May 10, 2017, Plaintiff was returning from lunch break to the LaSalle facility when Major Bennett accused Plaintiff of not wearing his seatbelt in a parking lot while the driver was parking, resulting in his removal from I.C.E. duty;

(5) Plaintiff was the only similarly situated male Transport Officer who was excluded from I.C.E. assignments/duties and removed to working "shift duty," which resulted in a deduction in pay; and

(6) Plaintiff complained on several occasions to his superiors about the adverse and disparate treatment, but Defendant took no action to investigate or stop the hostile work environment Plaintiff was subjected to.

5.8.    Remarkably, while Plaintiff was demoted and had his pay cut as a result of

allegedly not wearing a seatbelt, similarly situated female employee Berend was allowed to keep her position and pay despite the following:

(1) Berend was not required to wear a bullet-proof vest as the male employees were;

(2) Berend was required to be armed with a weapon while on duty at the Federal Courthouse, yet on at least one occasion, she refused to carry a weapon. This caused an argument and friction between Berend and other male LaSalle employees. Both Major Bennett and Warden Williams knew about Berend's actions but refused to discipline her;

(3) While going on-duty at the Federal Courthouse, Berend told another officer to give his badge to her newly hired co-worker, Officer Bobby Hicks ("Hicks") as Hicks did not yet have a badge. As they attempted to enter the Courthouse, Hicks was stopped by security as a result of the misappropriated badge. Berend's actions resulted in threatening letters to Defendant from federal government agencies regarding the Company adhering to its contract. Unlike Plaintiff and other male employees, *Berend was not disciplined for this egregious violation.* Berend's actions put the Courthouse's security in jeopardy, and showed her blatant disregard for Defendant's rules and the law; and

(4) At the end of 2017, Berend was promoted to a director and/or supervisor position within Human Resources for the Defendant.

5.9.    These are only a few examples of Berend and other female employees receiving preferential treatment when compared to Plaintiff. At the very least, Berend should have been demoted and received a pay cut as Plaintiff had suffered for not wearing a seatbelt in a parking lot.

5.10.    Plaintiff's removal from I.C.E. and subsequent transfer to shift duty was a result of his complaints about his treatment at the hands of female Defendant employees Berend and Major Bennet and ultimately, about his continued inquiry into pay discrepancies between male and female LaSalle employees.

5.11.    Through Plaintiff's complaints to supervisors Woolley and Arbuthnot, and Warden Williams' threatening Plaintiff in retaliation for his complaints, Defendant had full knowledge that Plaintiff had maintained that he was being discriminated against and was subject to a hostile work environment.

5.12.   Defendant is in violation of gender discrimination against Plaintiff. He was treated unfavorably specifically because he was a man, even though he was an exceptional employee with the same skills and success as other similarly situated female employees.

5.13.   By the aforesaid acts and omissions of Defendant, Plaintiff has been directly and legally caused to suffer actual damages including, but not limited to, loss of earnings and future earning capacity, attorneys' fees, costs of suit and other pecuniary losses not presently ascertained.

5.14.   As a further direct and legal result of the acts and conduct of Defendant, and each of them, as aforesaid, Plaintiff has been caused to and did suffer and continues to suffer severe anguish, humiliation, embarrassment, fright, shock, pain, discomfort, and anxiety. The exact nature and extent of said injuries is presently unknown to Plaintiff, who will seek leave of Court to assert the same when they are ascertained. Plaintiff does not know at this time the exact duration or permanence of said injuries, but is informed and believes, and thereon alleges, that some if not all of the injuries are reasonably certain to be permanent in character.

5.15.   Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court.

5.16.   Plaintiff is informed and believes, and thereon alleges, that the Defendant by engaging in the aforementioned acts and/or in ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, welfare and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

5.17.   As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided in Title VII of the Civil Rights Act of 1964, as amended.

5.18.   Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT II:**     **Sexually Hostile Work Environment in Violation of Title VII - 42 U.S.C. §2000e et. seq.**

5.19.   Plaintiff realleges and incorporates by reference all allegations set forth in all of the above paragraphs of this complaint.

5.20.   As discussed in more detail *supra*, Plaintiff alleges that Defendant as Plaintiff's employer subjected him to sexual harassment and a sexually hostile work environment in violation of § 42 U.S.C. § 2000e-2 et seq.

5.21.   Plaintiff is a member of a protected class – male. As discussed in more detail in *supra*, Plaintiff was subjected to unwelcome verbal conduct of a sexual nature which continued between approximately May 2016 until Defendant terminated Plaintiff on May 11, 2017.

5.22.   The instances of sexual harassment include but are not limited to the following:

(1)     Throughout Plaintiff's employment with Defendant, Berend called Warden Williams, the supervisor of Defendant's facility, "Daddy" when referencing him. Although Plaintiff asked Berend to stop referencing the Warden as "Daddy" because it made him uncomfortable, she refused to stop;

(2)     In May 2016, soon after leaving the Defendant's Johnson County facility to begin their day, Berend spoke openly to Plaintiff about her breasts and how she had them "lifted" and now they needed to be "refreshed." Plaintiff conveyed to Berend that referencing her breasts in conversation made him uncomfortable as it was inappropriate at work.  Berend then increased her flirtations with Plaintiff stating that Plaintiff actually liked the topic and was just being shy.  However, Plaintiff again repeated that her comments were inappropriate, he was not interested in her, and her comments made him uncomfortable, but Berend did not stop her comments; and

(3)     Later, Plaintiff and Berend were transporting a number of inmates from the Dallas Field Office ("DFO") to the Bedford jail. During this van ride Berend was engaged in a phone call lasting approximately thirty minutes with Warden Williams. The phone call was mostly of a personal nature. When Berend concluded the phone call she told Plaintiff not to say anything to anyone about the conversation. Plaintiff told Berend that these

types of phone calls with the Warden made him extremely uncomfortable because ultimately, Warden Williams was his boss. In response, Berend told our Plaintiff he needed to "lighten up."

5.23.    The following day, Plaintiff complained to both Woolley and Artbuthnot about the inappropriate conversations, but neither supervisor took any action.

5.24.    Only one (1) day after Plaintiff complained about Berend's behavior, Plaintiff was orally reprimanded by Warden Williams. In that oral reprimand, Warden Williams criticized and threatened Plaintiff for talking to a Major's wife (Berend), in the manner which he allegedly spoke to her, for example by stating that her comments made Garvin uncomfortable.   The Warden also told Plaintiff that he was "in the wrong", and further stated, "You're not going to say anything about this to anybody. You're going to keep your mouth shut and mind your own business."

5.25.    Plaintiff complained about the sexual conduct and subsequent hostile work environment, but his complaints were all ignored. Defendant failed to exercise reasonable care to prevent the aforementioned and described sexual harassment and sexually hostile work environment from occurring.

5.26.    Plaintiff would not have been subjected to the harassment but for his gender, as evidenced by the type of sexual remarks and conduct directed towards him.

5.27.    Plaintiff was an excellent employee for Defendant.

5.28.    The harassment of which Plaintiff complains was severe and pervasive and altered the terms and conditions of his employment and created a hostile and abusive work environment.

5.29.    On more than one occasion, Plaintiff complained of such harassment to supervisors and other management employees. Defendant knew or should have known about the

harassment and failed to take prompt remedial action and the sexually hostile work environment continued unabated until Plaintiff was terminated.

5.30.   As discussed in more detail in *supra*, Defendant failed to exercise reasonable care to prevent the aforementioned and described sexually hostile work environment from occurring. Defendant further failed to exercise reasonable care to correct promptly the aforementioned and described sexually harassing behavior.

5.31.   By the aforesaid acts and omissions of Defendant, Plaintiff has been directly and legally caused to suffer actual damages including, but not limited to, loss of earnings and future earning capacity, attorneys' fees, costs of suit and other pecuniary losses not presently ascertained.

5.32.   As a further direct and legal result of the acts and conduct of Defendant, and each of them, as aforesaid, Plaintiff has been caused to and did suffer and continues to suffer severe anguish, humiliation, embarrassment, fright, shock, pain, discomfort, and anxiety. The exact nature and extent of said injuries is presently unknown to Plaintiff, who will seek leave of Court to assert the same when they are ascertained. Plaintiff does not know at this time the exact duration or permanence of said injuries, but is informed and believes, and thereon alleges, that some if not all of the injuries are reasonably certain to be permanent in character.

5.33.   Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court.

5.34.   Plaintiff is informed and believes, and thereon alleges, that the Defendant by engaging in the aforementioned acts and/or in ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of

the rights, welfare and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

5.35.   As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided in Title VII of the Civil Rights Act of 1964, as amended.

5.36.   Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT III:   Retaliation in Violation of Title VII - 42 U.S.C. §2000e et. seq.**

5.37.   Plaintiff realleges and incorporates by reference all allegations set forth in all of the above paragraphs of this complaint.

5.38.   As discussed in more detail *supra*, Plaintiff further alleges that Defendant as Plaintiff's employer retaliated against him for engaging in protected activity in violation of 42 U.S.C. § 2000e-3(a) (i.e. reporting and objecting to sexual harassment and a sexually hostile work environment).

5.39.   Plaintiff opposed a discriminatory practice when he complained numerous times to management about the discrepancy in pay, and blatant disparate treatment of similarly situated male and female employees. In or around April 2015, after Plaintiff made inquiries and complaints about Defendant paying Plaintiff and his more experienced male co-workers less than similarly situated female employees, Plaintiff's supervisor, Arbuthnot, called Plaintiff while he was off-duty and at home, and threatened him for discussing the Defendant's wages. Arbuthnot told Plaintiff that he was heard discussing salaries at the courthouse earlier in the day, and that "there would be consequences" if he kept discussing and complaining about the wage discrepancy. Plaintiff informed Arbuthnot that he was legally allowed to openly discuss wages

and earnings while at his place of work. Arbuthnot concluded by telling Mr. Garvin that Warden Williams wanted him to "keep his mouth shut."

5.40.   Plaintiff was also retaliated against for complaining about his treatment at the hands of his superior, Major Judith Bennett who would often make fun of Plaintiff's hairline, drawing attention to him in front of his co-workers and even county inmates by saying such things as, "why don't you just cut it all off." Plaintiff asked Major Bennett to stop making these types of comments on numerous occasions, yet she continued. Plaintiff complained to his superiors Woolley and Arbuthnot, but they took no action to investigate or stop Bennett's treatment of Plaintiff.

5.41.   As described in detail above, Plaintiff was also retaliated against when he complained of inappropriate behavior he endured at the hands of female Transport Officer Diana Berend, who openly discussed her breasts with Plaintiff despite his requests that she stop because it made him extremely uncomfortable. This was followed by a phone call of a personal nature between Berend and Warden Williams while Plaintiff was present. Plaintiff again told Berend that these types of phone calls with the Warden made him extremely uncomfortable because ultimately, Warden Williams was his boss. The following day, Mr. Garvin complained to both Woolley and Artbuthnot about the inappropriate conversations, but neither supervisor took any action, as they ultimately answered to Warden Williams who had oversight of the Johnson County Correctional facility where they and Plaintiff worked.

5.42.   Just one (1) day after Plaintiff complained about Berend's behavior, Plaintiff was orally reprimanded by Warden Williams for telling Berend that her comments made Garvin uncomfortable.   The Warden also told Plaintiff that he was "in the wrong" and concluded by

telling him, "You're not going to say anything about this to anybody. You're going to keep your mouth shut and mind your own business."

5.43.   As a result of Plaintiff's interest in the pay disparities, the disparate treatment between male and female LaSalle employees, and his complaints about Berend's sexual harassment, Plaintiff was retaliated against in the following ways:

(1) In February 2017, Plaintiff was instructed by his supervisors, Woolley and Arbuthnot that he could no longer go to LaSalle's Dallas Field Office;

(2) Proximate in time to being told he could no longer go to the DFO, Plaintiff was assigned the task of transporting detainees to Dallas Fort Worth airport. However, Plaintiff's assignments to take detainees to the airport were abruptly halted without explanation. He was the only Transport Officer who was removed from this duty;

(3) Plaintiff was forced into "shift duty" at Defendant, which eliminated any seniority in terms of wages he enjoyed as a Transport Officer;

(4) Working under "shift duty," Plaintiff's hourly wage was greatly decreased when compared to his wage as a Transport Officer;

(5) With his reassignment to shift duty, there was no chance that Plaintiff would earn a significant pay increase to return him to the wages he earned while working as a Transport Officer;

(6) On or about May 10, 2017, Plaintiff was removed from I.C.E. duty for the not wearing his seatbelt in a parking lot while the driver was parking and he was in the passenger's seat.

5.44.   Proximate in time to the May 10, 2017 seatbelt incident, Plaintiff was removed by Warden Williams from his assignment, which was a federal detail under the U.S. Immigration and Customs Enforcement (I.C.E.). This materially affected Mr. Garvin's pay as the I.C.E. duty paid $16.54 per hour compared to the $10.50 per hour for normal pay which Plaintiff would have been paid henceforth.

5.45.   Finally, on or about May 11, 2017, due to the continuing harassment and retaliation which resulted in a demotion and a forthcoming loss in pay, Plaintiff was left with no choice but to resign from his position with Defendant.

5.46.    In the rare instance where Defendant reassigned a Transport Officer to shift duty, there was a process that was followed. Reassignment occurred as a disciplinary measure against employees who were consistently late for work, or who had received numerous complaints from the county courthouse. None of these instances applied to Plaintiff. In addition, the reassignments would be for a term of only 60-90 days. Plaintiff had not received any write-up in the previous three (3) years, he was denied any sort of investigatory process, and he was reassigned to shift duty without explanation and without any sort of improvement plan. Plaintiff's removal from I.C.E. detail to shift duty was a strictly retaliatory measure and a pretext for discrimination.

5.47.    By the aforesaid acts and omissions of Defendants Plaintiff has been directly and legally caused to suffer actual damages including, but not limited to, loss of earnings and future earning capacity, attorneys' fees, costs of suit and other pecuniary loss not presently ascertained, for which Plaintiff will seek leave of Court to amend when ascertained.

5.48.    As a further direct and legal result of the acts and conduct of Defendant, as aforesaid, Plaintiff has been caused to and did suffer and continues to suffer severe emotional and mental distress, anguish, humiliation, embarrassment, fight, shock, pain, discomfort, and anxiety. The exact nature and extent of said injuries is presently unknown to Plaintiff, who will seek leave of Court to assert the same when they are ascertained. Plaintiff does not know at this time the exact duration or permanence of said injuries, but is informed and believes, and thereon alleges, that some if not all of the injuries are reasonably certain to be permanent in character.

5.49.    Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court.

5.50.   Plaintiff is informed and believes, and thereon alleges, that the Defendant, by engaging in the aforementioned acts and by ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of Plaintiff's rights, welfare, and safety, thereby justifying an award of punitive and exemplary damages in an amount to be determined at trial.

5.51.   As a result of Defendant's harassing and discriminatory acts as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided in Title VII of the Civil Rights of 1964, as amended.

5.52.   Plaintiff also requests relief as described in the Prayer for Relief below.

**COUNT IV:   Wrongful Termination in Violation of Public Policy in Violation of Chapter 21 of the Texas Labor Code**

5.53.   Plaintiff realleges and incorporates by reference all allegations set forth in all of the above paragraphs of this complaint.

5.54.   The Texas Commission on Human Rights Act protects Texas employees from discriminatory discharge. Texas Labor Code section 21.055 states as follows:

> An employer, labor union, or employment agency commits an unlawful employment practice if the employer, labor union, or employment agency retaliates or discriminates against a person who, under this chapter:
>
> (1) opposes a discriminatory practice;
> (2) makes or files a charge;
> (3) files a complaint; or
> (4) testifies, assists, or participates in any manner in an investigation, proceeding, or hearing.

5.55.   A plaintiff who brings a civil tort action for wrongful discharge and/or constructive discharge must meet the following criteria: "Whether an employee would feel forced to resign is case and fact specific, but the following factors are relevant, singly or in

combination: (1) demotion, (2) reduction in salary, (3) reduction in job responsibilities, (4) reassignment to menial or degrading work, (5) reassignment to work under a younger or less experienced/ qualified supervisor, (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation, or (7) offers of early retirement (or employment on terms less favorable than the employee's former status)." *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649-50 (5th Cir. 2004) (citing *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)).

5.56.   Where an adverse employment action occurs within a reasonable time after plaintiff's exercise of a protected right, discriminatory intent may be inferred. "Specifically, when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred." *Passantino*, 507.

5.57.   The Plaintiff was disciplined for unfounded reasons.

5.58.   As discussed in more detail *supra*, Plaintiff substantially performed his job duties above all industry standards, and yet the Defendant harassed and retaliated against him when he made inquiries about disparities in pay or attempted to complain to his supervisors about a sexually hostile work environment, and disparate treatment from the female employees. Plaintiff had also continued inquire about the differences in wages earned by similarly situated male and female employees.

5.59.   Despite knowing that Plaintiff was hired as a Transport Supervisor and worked as a Transport Supervisor during the majority of his six-year employment at Defendant, Plaintiff was re-assigned to lower paying duty proximate in time to his complaining to his supervisors about the disparate treatment and sexual harassment.

5.60.    As a result of the ongoing harassment, retaliation, and cut in pay, Plaintiff could no long tolerate and afford to work for Defendant, and he was forced to resign as an employee of the Company on May 11, 2017.

5.61.    Plaintiff was constructively and wrongfully terminated, and Defendant is liable for its adverse actions against Plaintiff.

5.62.    Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT V:**    **Sexually Hostile Work Environment in Violation of Chapter 21 of the Texas Labor Code**

5.63.    Plaintiff realleges and incorporates by reference all allegations set forth in all of the above paragraphs of this complaint.

5.64.    As discussed in more detail *supra*, Plaintiff alleges that Defendant as Plaintiff's employer subjected him to sexual harassment and a sexually hostile work environment in violation of Chapter 21 of the Texas Labor Code commonly referred to as the Texas Commission on Human Rights Act.    Texas courts have defined sex discrimination to include sexual harassment.

5.65.    Plaintiff is member of a protected class -- male.    Plaintiff was subjected to unwelcome verbal conduct of a sexual nature which continued between approximately May 2016 until Defendant terminated Plaintiff on May 11, 2017.

5.66.    Plaintiff would not have been subjected to the harassment but for his gender, evidenced by the type of sexual acts his co-workers simulated, the remarks and the conduct directed towards him.

5.67.    The harassment of which Plaintiff complained was severe and pervasive and altered the terms and conditions of her employment and created a hostile and abusive work environment.

5.68.   As discussed in more detail *supra*, on more than one occasion, Plaintiff complained of such harassment to his supervisors.  Defendant knew or should have known about the harassment and failed to take prompt remedial action and the sexual harassment and sexually hostile work environment continued unabated until Plaintiff was constructively terminated from his position.

5.69.   Defendant failed to exercise reasonable care to prevent the aforementioned behavior and described sexual harassment and sexually hostile work environment from occurring. Defendant further failed to exercise reasonable care to correct promptly the aforementioned and described sexually harassing behavior.

5.70.   By the aforesaid acts and omissions of Defendant, Plaintiff has been directly and legally caused to suffer actual damages including, but not limited to, loss of earnings and future earning capacity, attorneys' fees, costs of suit and other pecuniary losses not presently ascertained.

5.71.   As a further direct and legal result of the acts and conduct of Defendant, and each of them, as aforesaid, Plaintiff has been caused to and did suffer and continues to suffer severe anguish, humiliation, embarrassment, fright, shock, pain, discomfort, and anxiety. The exact nature and extent of said injuries is presently unknown to Plaintiff, who will seek leave of Court to assert the same when they are ascertained. Plaintiff does not know at this time the exact duration or permanence of said injuries, but is informed and believes, and thereon alleges, that some if not all of the injuries are reasonably certain to be permanent in character.

5.72.   Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court.

5.73.   Plaintiff is informed and believes, and thereon alleges, that the Defendant by engaging in the aforementioned acts and/or in ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, welfare and safety of Plaintiff, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

5.74.   As a result of Defendant's conduct as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided in Title VII of the Civil Rights Act of 1964, as amended.

5.75.   Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT VI:   Retaliation in Violation of Chapter 21 of the Texas Labor Code**

5.76.   Plaintiff realleges and incorporates by reference all allegations set forth in all of the above paragraphs of this complaint.

5.77.   As discussed in more detail *supra*, Plaintiff further alleges that Defendant as Plaintiff's employer retaliated against him for engaging in protected activity in violation of Chapter 21 of the Texas Labor Code commonly referred to as the Texas Commission on Human Rights Act (i.e. reporting and objecting to a sexually hostile work environment).

5.78.   Plaintiff opposed a discriminatory practice when he complained about a sexually hostile work environment. In spite of performing his duties in a professional manner and following Defendant's policies, Plaintiff's complaints were ignored by Defendant and Plaintiff was terminated.

5.79.   Plaintiff was also subjected to other retaliatory actions by Defendant and its employees, including:  (1) In February 2017, Plaintiff was instructed by his supervisors that he could no longer go to Defendant's Dallas Field Office; (2) Proximate in time to being told he

could no longer go to the DFO, Plaintiff's assignments to take detainees to the airport were abruptly halted without explanation; (3) Plaintiff was forced into "shift duty", which eliminated any seniority in terms of wages he enjoyed as a Transport Officer; (4) Plaintiff's hourly wage was greatly decreased when compared to his wage as a Transport Officer; (5) With his reassignment to shift duty, there was no chance that Plaintiff would be unable to earn any significant pay increase; and (6) On or about May 10, 2017, Plaintiff was removed from I.C.E. duty resulting in another significant pay decrease.

5.80.   On May 11, 2017, Defendant constructively terminated Plaintiff, whose termination occurred within a couple of months after Plaintiff's continuous complaints to Defendant about the unlawful treatment he was subjected to while at work, by Defendant's employees.

5.81.   By the aforesaid acts and omissions of Defendant, Plaintiff has been directly and legally caused to suffer actual damages including, but not limited to, loss of earnings and future earning capacity, attorneys' fees, costs of suit and other pecuniary loss not presently ascertained, for which Plaintiff will seek leave of Court to amend when ascertained.

5.82.   As a further direct and legal result of the acts and conduct of Defendant, as aforesaid, Plaintiff has been caused to and did suffer and continues to suffer severe emotional and mental distress, anguish, humiliation, embarrassment, fight, shock, pain, discomfort, and anxiety. The exact nature and extent of said injuries is presently unknown to Plaintiff, who will seek leave of Court to assert the same when they are ascertained. Plaintiff does not know at this time the exact duration or permanence of said injuries, but is informed and believes, and thereon alleges, that some if not all of the injuries are reasonably certain to be permanent in character.

5.83.   Plaintiff has been generally damaged in an amount within the jurisdictional limits of this Court.

5.84.   Plaintiff is informed and believes, and thereon alleges, that the Defendant, by engaging in the aforementioned acts and by ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of Plaintiff's rights, welfare, and safety, thereby justifying an award of punitive and exemplary damages in an amount to be determined at trial.

5.85.   As a result of Defendant's harassing and discriminatory acts as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided in Title VII of the Civil Rights of 1964, as amended.

5.86.   Plaintiff requests relief as described in the Prayer for Relief below.

## VI.   CONDITIONS PRECEDENT

6.1.   All conditions precedent to bringing this lawsuit have occurred, been performed or are or have been waived such that this lawsuit is properly before this Court.

## VII.   ECONOMIC AND ACTUAL DAMAGES

7.1.   Plaintiff sustained the following economic and actual damages as a result of the actions and/or omissions of Defendant described hereinabove:

(a)   Compensatory and actual damages, front pay, back pay, out-of-pocket expenses, court cost and expenses;
(b)   Attorney's fees reasonable and necessary;
(c)   Prejudgment and Post judgment interest;
(d)   Lost earnings;
(e)   Contract damages and inconveniences;
(f)   Expenses for psychological care and counseling;
(g)   Reasonable medical care and expenses in the past;
(h)   Reasonable and necessary medical care and expenses which will in all reasonable probability be incurred in the future; and

(i)      Exemplary damages and Expert fees.

## VIII.   DAMAGES FOR MENTAL ANGUISH

8.1.    Plaintiff would further show that the conduct, statements, acts and/or omissions described hereinabove were committed "knowingly," in that Defendant had actual awareness of the falsity, deception, or unfairness of such acts, practices, and/or omissions.

8.2.    As a result of such acts, practices and/or omissions, Plaintiff sustained a high degree of mental pain and distress of such nature, duration and severity that would permit the recovery of damages for mental anguish pursuant to, and for which Plaintiff hereby sues in an amount in excess of the minimum jurisdictional limits of this Court.

## IX.   EXEMPLARY DAMAGES

9.1.    Plaintiff would further show that the acts and omissions of Defendant complained of herein were committed knowingly, willfully, intentionally, with actual awareness, and with the specific and predetermined intention of enriching said Defendant at the expense of Plaintiff. In order to punish said Defendant for such unconscionable overreaching and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery from Defendant for exemplary damages as provided by Section 41.003(1) of the Texas Civil Practice and Remedies Code.

## X.   ATTORNEYS' FEES

10.1.    It was necessary for Plaintiff to hire the undersigned attorney to file this lawsuit. Upon judgment, Plaintiff is entitled to an award of attorney fees and costs under 42 U.S.C. § 1988, 42 U.S.C. 2000e-5 et seq, and 29 U.S.C. 209 sec. 107(a)(3).

## XI.   JURY TRIAL

11.1.    Trial by jury is demanded.

## XII.   PRAYER

As a proximate cause of the foregoing, Plaintiff has suffered damages including but not

limited to emotional pain and suffering, mental anguish, lost wages, and economic and actual

damages and seek the following relief from Defendant:

a.   A declaration that the acts and practices complained of in this Complaint are in violation of Title VII of the Civil Rights Act of 1964, as amended, the Texas Commission on Human Rights Act, and the United States Constitution via 42 U.S.C. § 1983;

b.   An order directed at Defendant specifically prohibiting further retaliatory actions against Plaintiff;

c.   Economic and actual damages, including but not limited to, lost past wages and benefits from Defendant for violations of Title VII of the Civil Rights Act of 1964, as amended, and Texas Commission on Human Rights Act, as well as for the Constitutional violations;

d.   Lost future wages and benefits from Defendant for violations of Title VII of the Civil Rights Act of 1964, as amended, and Texas Commission on Human Rights Act Defendant, as well as for the Constitutional violations;

e.   Reinstatement of Plaintiff or front pay should the Court find reinstatement untenable;

f.   Compensatory damages from Defendant for violations of Title VII of the Civil Rights Act of 1964, as amended and Texas Commission on Human Rights Act, as well as for the Constitutional violations;

g.   Statutory Damages;

h.   Exemplary and/or Punitive Damages;

i.   Damages for Mental Anguish;

j.   Awarding such other relief, legal or equitable, as may be warranted; and

k.   Plaintiff further seeks pre- and post-judgment interest, costs of court, attorney's fees, expert fees, and litigation expenses for trial and appeal.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Justin Garvin respectfully prays

that the Defendant be cited to appear and answer herein, and that upon a final hearing of the

cause, judgment be entered for the Plaintiff against Defendant for the economic and actual damages requested hereinabove in an amount in excess of the minimum jurisdictional limits of the Court, together with prejudgment and post judgment interest at the maximum rate allowed by law, back pay, front pay, attorney's fees, costs of court, exemplary damages and such other and further relief to which the Plaintiff may be entitled at law or in equity, whether pled or unpled.

**Dated:   July 2, 2018**                                     Respectfully Submitted,

Andrea S. Loveless
Texas State Bar No. 24041889
1301 Ballinger Street
Fort Worth, Texas 76102
(949) 679-4690
Fax (949) 666-7424
andrea@lovelesslawfirm.com

**Attorney for Plaintiff**