UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JUSTIN GARVIN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:18-CV-1732-B |
| | § | |
| SOUTHWESTERN CORRECTIONAL, | § | |
| L.L.C., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant's Second Motion to Dismiss (Doc. 13). For the following reasons, the Court **GRANTS in part** and **DENIES in part** the Motion.

## I.

## BACKGROUND[1]

This is a case involving claims under Title VII of the Civil Rights Act of 1964 and Texas Commission on Human Rights Act ("TCHRA"). Plaintiff Justin Garvin brought his claims against his employer Defendant Southwestern Correctional, LLC (also known as LaSalle), on July 2, 2018. Doc. 1, Compl.; Doc. 12, Am. Compl., ¶ 2.2. Plaintiff was employed with Defendant from 2012 to 2017, in the jail transport division. Doc. 12, Am. Compl., ¶¶ 4.1, 4.21. He alleges that not long after he began his employment, he witnessed and was adversely affected by sexual favoritism in the

---

[1] The Court draws its factual history from Plaintiff's Amended Complaint (Doc. 12). Defendant has repeatedly denied all of the allegations. Doc. 6, Def.'s Orig. Mot., 1. Because the Court today is reviewing a motion to dismiss, the Court takes all of Plaintiff's well-pleaded allegations as true. Thus, this opinion should not be construed as making official findings on disputed facts.

- 1 -

workplace. *Id.* ¶¶ 4.2–4.3. He alleges he inquired about the disparate pay between the sexes, and made his discomfort known about the teasing, harassment, and work environment he experienced. *E.g., id.* ¶¶ 4.4, 4.8, 4.9. He alleges that Defendant—through its employees—responded not by addressing his concerns, but instead by shunting him to less and less desirable and lucrative work assignments, until finally he had no other recourse but to quit. *Id.* ¶¶ 4.5, 4.9–4.21. It is upon these injuries that he bases his claims.

Specifically, Plaintiff asserts three federal and three state-law causes of action: (1) Title VII gender discrimination; (2) Title VII sexually hostile work environment; (3) Title VII retaliation; (4) state-law wrongful termination; (5) state-law sexually hostile work environment; and (6) state-law retaliation. *Id.* ¶¶ 5.1–5.88. He seeks reinstatement to his former job duties, as well as damages for wrongful termination. *Id.* ¶ 1.1.

A.     *Factual Background*

Because Title VII claims are so fact-specific, the Court pauses to more fully explore the allegations. Plaintiff worked as a transport officer for Defendant; his fellow transport officers included Diana Berend, a woman. *Id.* ¶¶ 4.6, 4.20. His direct supervisor was Sergeant Arbuthnot; also above Plaintiff in rank was Warden Eddie Williams and Major Judith Bennett. *Id.* ¶¶ 4.1, 4.2, 4.5. Arbuthnot ultimately answered to the Warden. *Id.* ¶ 4.10.

For much of his employment with Defendant, Plaintiff transported prisoners to and from Defendant's facilities and various destinations, including the airport and courthouses. *Id.* ¶¶ 4.9, 4.12, 4.15. For a while he earned a higher rate for his assignments—those involving Immigrations Customs and Enforcement (ICE)—until he was shunted to less lucrative assignments. *Id.* ¶ 4.12.

Shortly after starting his employment, he noticed that the Warden treated female employees

better than male employees, even when similarly situated. *Id.* ¶ 4.2. After he inquired with other employees in 2015, his supervisor allegedly responded by calling Plaintiff "while he was off-duty and at home, and threatened him for discussing LaSalle's wages," and that "'there would be consequences' if he kept it up." *Id.* ¶ 4.3. Even when Plaintiff pointed out that he believed federal law protected his conversations, he says his supervisor "concluded by telling [Plaintiff] that Warden Williams wanted him to 'keep his mouth shut.'" *Id.*

Plaintiff's primary example of a woman treated preferentially is his coworker and fellow transport officer Diana Berend, who was married to another major working for Defendant.[2] *Id.* ¶ 4.6. He alleges that "[i]t was a common belief among [Plaintiff] and other LaSalle employees that Berend and Warden Williams had a sexual relationship." *Id.* ¶ 4.7. He alleges that the Warden gave Berend a higher hourly pay rate and preferential title compared to Plaintiff, "even though Berend is significantly less qualified and experienced[.]" *Id.* According to Plaintiff, Berend herself acknowledged this preferential treatment, informing Plaintiff that "if Warden William's wife knew that she worked with the Warden, his wife would divorce him." *Id.* ¶ 4.6. Allegedly, she would tell her coworkers that she was "'moving up and [Warden] is taking me places.'" *Id.* ¶ 4.7.

Plaintiff also describes several acts Berend got away with without receiving a demotion or pay cut. He alleges that Berend was not required to wear a bulletproof vest as the male employees were. *Id.* ¶ 5.9. On one occasion, she refused to carry a weapon while on duty—even though it was a job

---

[2] Plaintiff also claims that he was teased by another woman and superior officer, Bennett, throughout his employment with Defendant. *Id.* ¶ 4.5. Plaintiff, who describes himself as six-foot eight, with a receding hairline and bald spot, alleges that she subjected him to taunts of "'why don't you just cut it all off'" and other demeaning comments. *Id.* ¶¶ 4.2, 4.5. When Plaintiff would ask her to stop the teasing, "she would respond dismissively, 'It's funny, Garvin.'" *Id.* ¶ 4.5. When Plaintiff reported this to his supervisors, they took no action to investigate or stop Bennett. *Id.* He alleges that beyond his supervisors, he had no further recourse to make the harassment stop. *Id.*

requirement. *Id.* Allegedly this caused an argument and friction between Berend and other male employees. *Id.* On another occasion:

> While going on-duty at the Federal Courthouse, Berend told another officer to give his badge to her newly hired co-worker, Officer Bobby Hicks ("Hicks") as Hicks did not yet have a badge. As they attempted to enter the Courthouse, Hicks was stopped by security as a result of the misappropriated badge. Berend's actions resulted in threatening letters to Defendant from federal government agencies regarding the Company adhering to its contract.

*Id.* Plaintiff alleges that Berend was not disciplined for this violation, unlike Plaintiff and other male employees. *Id.* Eventually, at the end of 2017, she was promoted to a position within Human Resources. *Id.*

But before that—starting in May 2016, as Plaintiff alleges—"Berend would speak openly and often to [Plaintiff] about her breasts while sometimes even touching her own breasts in front of him, and she would describe her breasts, how she had them 'lifted' and that she now wanted them 'refreshed.'" *Id.* ¶ 4.8. And even though Plaintiff told her how uncomfortable the conversation made him, and how it was inappropriate at work, she "then increased her flirtations with [Plaintiff] stating that [Plaintiff] actually liked the topic and was just being shy." *Id.* On at least one other occasion, Plaintiff was witness to Berend's half-hour call "of a personal nature" with the Warden while at work. *Id.* ¶ 4.9. Again, when Plaintiff evinced his discomfort, Berend told him to "'lighten up.'" *Id.* And even when he complained to his supervisors the following day, neither took action; both ultimately answered to the Warden. *Id.* ¶ 4.10.

One day after Plaintiff complained about Berend's behavior, the Warden reprimanded Plaintiff. *Id.* ¶ 4.11. He told him that Plaintiff was "in the wrong" and that he should not have told Berend that her comments made him uncomfortable. *Id.* Two weeks later, the Warden removed

Plaintiff from his comparatively lucrative assignment with ICE—at $16.50 per hour—to one that paid $10.50 per hour. *Id.* ¶ 4.12. Allegedly, when Plaintiff inquired why, he was asked who he trusted on his team. *Id.* His supervisors then briefly interviewed that person—Dan Finely—before returning to Plaintiff with the news that Finely was the source of complaints about Plaintiff slacking, hence the demotion. *Id.* But Finely subsequently denied making any such complaint. *Id.* Plaintiff alleges that in fact, one of Plaintiff's supervisors told Plaintiff that the Warden had instructed them to figure out a way to remove Plaintiff from his ICE assignment. *Id.* ¶ 4.13.

Eight to nine months later, around February 2017, Plaintiff was removed from two other work assignments. First, he was told he could no longer go to Defendant's Dallas Field Office. *Id.* ¶ 4.14. This made it impossible for him to receive ICE duty pay. *Id.* He was then the only transport officer removed from airport duty. *Id.* ¶ 4.15. In both cases he noted circumstances that made it appear that he was being singled out. *Id.* ¶¶ 4.14–4.15.

On or about May 10, 2017, he was reassigned to shift duty, about half an hour after the Warden and several other higher-ranking employees saw him in a parking lot without a seatbelt and confronted him. *Id.* ¶¶ 4.16–4.21. Plaintiff sought but received no explanation from the Warden for the reassignment. *Id.* ¶ 4.20. According to Plaintiff, reassigning a transport officer to shift duty was a rare occurrence, and typically "occurred as a disciplinary measure against employees who were consistently late for work, or who had received numerous complaints from the county courthouse"—none of which applied to him. *Id.* ¶ 4.19. In fact, he had not received any write-ups in the previous three years. *Id.* With his removal to shift duty, Plaintiff would be working in one of Defendant's lower-paying jobs; any seniority in terms of wages he enjoyed as a transport officer would be taken from him, and he would be treated as a new hire. *Id.* ¶ 4.20. Plaintiff reports that "he would

not have the opportunity to make an amount of pay equal to that which he was earning as a transport officer, and there was no chance that he would earn a significant pay increase to return him to that level." *Id.* Confronted with these prospects, Plaintiff resigned the following day. *Id.* ¶ 4.21. This suit ensued.

*B.     Procedural Background*

There has already been one motion to dismiss in this case, which the Court granted on February 1, 2019, with leave to amend. Plaintiff refiled his complaint, attaching his Right to Sue Notice.[3] Doc. 12-1, Compl., Ex. A (Plaintiff's Right to Sue Notice). Defendant responded with a second motion to dismiss. Doc. 13. Defendant incorporated its original motion to dismiss (Docs. 5, 6, & 10), arguing that the majority of Plaintiff's complaint was unchanged.[4] Doc. 14, Second Mot., 1–2. Plaintiff responded (Doc. 15), and Defendant replied (Doc. 16), again incorporating its original motion-to-dismiss reply (Doc. 10).

As all briefing has been received, the Court considers the motion.

## II.

## LEGAL STANDARD

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) authorizes a court to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." *Id.* 12(b)(6). In considering a Rule 12(b)(6) motion to dismiss,

---

[3] Defendant does not dispute that Plaintiff has satisfied all procedural prerequisites to filing a Title VII suit on the claims pled. *See* Doc. 6, Def.'s Original Mot., 15–16.

[4] Because the majority of Defendant's substantive argument is found in its original motion and briefing, the Court will cite predominately to Doc. 6 as opposed to Defendant's later filings.

"[t]he court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). "The court's review [under 12(b)(6)] is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim *and* referenced by the complaint." *Ironshore Europe DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019) (emphasis added) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citation omitted)).

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* When well-pleaded facts fail to achieve this plausibility standard, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (cleaned up).

In employment discrimination cases, "the ordinary rules for assessing the sufficiency of a complaint apply." *Sandifer v. Donahoe*, 2015 WL 5552644, at *4 (E.D. La. Sept. 16, 2015) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). "[A]n employment discrimination plaintiff need not plead a prima facie case" in order to survive a Rule 12 motion. *Swierkiewicz,* 534 U.S. at 515 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'").

III.

ANALYSIS

As an initial matter, the Court notes that Plaintiff has brought claims under both federal and state law (specifically the TCHRA). Several of these claims can be analyzed together applying federal case law, as claims under TCHRA and Title VII are substantively identical. *See Harris v. Honda*, 213 F. App'x 258, 260–61 (5th Cir. 2006). Thus the Court addresses counts 2 and 5 together (sexually hostile work environment); and counts 3 and 6 together (retaliation). And because both of the remaining claims involve Plaintiff's allegations of constructive discharge, the Court considers count 1 (Title VII gender discrimination) and count 4 (state-law wrongful termination) together.[5]

A.  *Sexually Hostile Work Environment (counts 2 and 5).*

Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex[.]" 42 U.S.C. § 2000e–2(a)(1). Sexual harassment claims arise from two principal theories: quid pro quo and hostile work environment. *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 409 (5th Cir. 2002); *Harvey v. Chevron U.S.A., Inc.*, 961 F. Supp. 1017, 1029 (S.D. Tex. 1997). Plaintiff brings his claim on the latter theory: hostile work environment. Doc. 12, Am. Compl., ¶¶ 5.21–5.38.

The Court addresses as an initial matter Defendant's question of whether Plaintiff can recover based on acts that occurred more than 300 days before he filed his EEOC charge. *See* Doc.

---

[5] In his response, Plaintiff organizes his claims in the same way, except he addresses gender discrimination and wrongful termination separately. Doc. 15, Pl.'s Resp., i. Defendant's motion to dismiss sequentially addresses gender discrimination, hostile work environment, retaliation, and wrongful termination. Doc. 6, Def.'s Orig. Mot., ii.

10, Orig. Reply, 4. Courts typically treat hostile-work-environment claims as involving "continuing violations." *Heath v. Bd. of Supervisors for S. Univ. & Agric. & Mech. Coll.*, 850 F.3d 731, 737 (5th Cir. 2017) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–17 (2002)) ("Hostile environment claims are 'continuing' because they involve repeated conduct, so the 'unlawful employment practice' cannot be said to occur on any particular day."). This means that, for example, unless the employer took some measures to address the complained-of conduct, "the entire time period of the hostile environment may be considered by a court for the purposes of determining liability" "[a]s long as an act contributing to the claim occurs within the filing period[.]" *Id.* (internal quotation omitted). Thus, for this claim, the Court considers all of the alleged conduct.

The parties also dispute how allegations of what is referred to as "sexual favoritism" relate to a hostile-work-environment claim. Some courts explicitly recognize that such favoritism can create a hostile-work-environment claim under Title VII. *See, e.g.*, *Broderick v. Ruder*, 685 F. Supp. 1269, 1278 (D.D.C. 1988). The EEOC divides this favoritism into two categories: isolated incidents—a supervisor directing attention at one individual, which is not actionable under Title VII—and widespread favoritism, which is actionable.[6] EEOC Notice No. 915–048, Policy Guidance on Employer Liability under Title VII for Sexual Favoritism (Jan. 12, 1990). But Defendant argues that courts in this Circuit, along with many others, have largely declined to entertain any claims based on favoritism. Doc. 6, Def.'s Orig. Mot., 7 (citing *Harvey*, 961 F. Supp. at 1029 (collecting cases)).

Here, Defendant paints with too wide a brush. For example, in *Harvey*, the court relied in part on the EEOC's 1990 guidance to narrowly hold that the plaintiff's allegations were favoritism

---

[6] EEOC guidance can be persuasive in discrimination cases. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

of the first category—isolated incidents—and not actionable. *Id.* at 1029–30. Defendant misquotes and misconstrues *Harvey*—the court did *not* hold that sexual favoritism is never an unlawful employment practice. *Compare* Doc. 6, Def.'s Orig. Mot., 7 *with Harvey*, 961 F. Supp. at 1030 (holding narrowly that the particular allegations of sexual favoritism were not discrimination under Title VII). In fact, the court needn't have even held that isolated incidents of favoritism were not actionable, as the court went on to state that even if the claim was viable, the plaintiff hadn't met her burden to prove it. *See id.* (finding that even if such claim were actionable, the plaintiff had no facts to show the alleged romantic relationship existed, nor that there was any preferential treatment). And many courts outside this Circuit recognize the distinction between the two types of favoritism and opine accordingly. *See, e.g.*, *Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 908 (8th Cir. 2006) (acknowledging the distinction between the types of favoritism).

In addition, this Court is not persuaded that the Fifth Circuit has decisively ruled on this issue.[7] Instead, the Fifth Circuit has looked on a case-by-case basis whether the disparate treatment is "directly related to impermissible gender-based distinctions"—in other words, if a plaintiff can show that the favoritism adversely affected one gender more than the other. *See Ellert*, 52 F.3d at 546. And a hostile-work-environment claim requires a court view the "totality of the circumstances,"

---

[7] The Court rejects Defendant's attempt to construe *Ellert v. University of Texas, at Dallas*, 52 F.3d 543 (5th Cir. 1995)—which both parties cite favorably—as making this point. Defendant argues that in that case, the Fifth Circuit "specifically rejected the notion that a Title VII claim can be based upon a supervisor's voluntary sexual relations with a subordinate." Doc. 6, Def.'s Orig. Mot., 6–7 (citing *id.* at 546). But *Ellert*'s holding is more subtle, because this question was not squarely before the Circuit. In *Ellert*, the Circuit simply acknowledged (1) that courts that allow sexual favoritism claims are in the minority; (2) that employment decisions covered by Title VII must relate to impermissible gender-based distinctions; and (3) that successful claims "based upon a supervisor's voluntary sexual relationship with a subordinate . . . usually were premised upon the paramour receiving some form of preferential treatment over the claimant." *Ellert*, 52 F.3d at 546 (citing out-of-Circuit examples). And in *Ellert*, the plaintiff did not allege that the paramour received preferential treatment. *Id.* Here, however, Plaintiff does allege that the Warden treated Berend preferentially.

and not consider the alleged conduct piecemeal. *Donaldson v. CDB Inc.*, 335 F. App'x 494, 501 (5th Cir. 2009). Thus, the Court advances in its analysis assuming that sexual favoritism in some form can contribute to a hostile-work-environment claim.

To establish a claim for hostile work environment in general, Plaintiff must show: (1) he belongs to a protected group; (2) he was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment; and (5) the employer knew or should have known and failed to take prompt remedial action. *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999). When the alleged harasser is a supervisor with immediate or higher authority over the plaintiff, the plaintiff need only meet the first four elements of the test. *Id.*

"[D]etermining whether a hostile-work environment exists takes into account the totality of the circumstances, including such factors as: (1) the frequency of the conduct; (2) its severity; (3) the degree to which the conduct is physically threatening or humiliating; and (4) the degree to which the conduct unreasonably interferes with an employee's work performance." *Donaldson*, 335 F. App'x at 501–02 (citing *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005)). This inquiry involves a subjective and objective component. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). In addition to the plaintiff's subjective perception of the abusiveness of the environment, the environment must be such that a reasonable person would find it hostile or abusive. *Id.* That is, "this subjective perception must be objectively reasonable." *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted).

Here, the Court finds that Plaintiff's allegations do not state a claim for hostile work environment. Plaintiff has failed to plausibly allege sufficient facts to establish severe or pervasive harassment. Plaintiff names only one person—Berend—who was treated favorably on the basis of her alleged sexual relationship with a supervisor. This does not support the inference of widespread sexual favoritism. Instead, this appears more like an isolated incident of favoritism, which courts like *Harvey* have held to be insufficient to show a hostile work environment. The alleged teasing by Major Bennett about Plaintiff's appearance—focused on characteristically male traits, and made in front of other employees and inmates—was clearly humiliating and boorish, if true. Likewise, Berend's alleged comments about her breasts and relationship with their supervisor—if true—were inappropriate for the workplace. But taken together, Plaintiff's allegations fail to allege sufficiently severe or pervasive harassment to proceed. *See, e.g.*, *Malin v. Orleans Par. Commc'n Dist.*, 718 F. App'x 264, 273 (5th Cir. 2018) (upholding a 12(b)(6) dismissal because a reasonable person would not believe that a coworker describing her sex life six times was severe or pervasive enough to create an actionable hostile work environment).

Thus, the Court **GRANTS** Defendant's motion to dismiss Plaintiff's hostile-work-environment claim.

B.  *Retaliation (counts 3 and 6).*

To establish a prima facie case of retaliation, Plaintiff must show: (1) that he engaged in activity protected by Title VII; (2) that he suffered an adverse employment action; and (3) that a causal connection exists between the protected activity and the adverse employment action. *See Webb v. Cardiothoracic Surgery Assoc. of N. Tex., P.A.*, 139 F.3d 532, 540 (5th Cir. 1998) (*abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)). At the pleading

stage, a plaintiff may survive a Rule 12(b)(6) motion without pleading a prima facie case, however, courts can and do consider theses elements at this stage. *E.g., Gallentine v. Hous. Auth. of City of Port Arthur, Tex.*, 919 F. Supp. 2d 787, 806–07 (E.D. Tex. 2013).

Again, as an initial matter, the Court addresses Defendant's question of whether Plaintiff can recover based on acts that occurred more than 300 days before he filed his EEOC charge. Doc. 10, Orig. Reply, 5. Unlike a hostile-work-environment claim, "a retaliation claim based on discrete acts cannot rely on a continuing violation theory." *Heath*, 850 F.3d at 741 & n.5 (noting that the Fifth Circuit has not recognized a retaliatory hostile-work-environment cause of action). Thus, with such a claim, the earliest discrete acts of retaliation—*i.e.*, the adverse employment actions—on which Plaintiff can rely must have occurred within the 300 days before he filed his EEOC complaint. *See id.* at 741–42. Plaintiff's EEOC charge was filed on January 24, 2018. Doc. 6-1, Ex. 1 (EEOC charge). Three hundred days prior would be the end of March 2017. Thus, the only discrete adverse employment action the Court may consider for Plaintiff's retaliation claim is after that point—in other words, the reassignment to shift duty. However, a court may consider *protected activities* for which a plaintiff has been retaliated against that occurred outside this period. *See id.* at 742 (considering a protected activity outside the 300-day period).

For the first element, an employee has engaged in protected activity if he has (1) "opposed any practice made an unlawful employment practice by this subchapter," or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427–28 (5th Cir. 2000) (quoting 42 U.S.C. § 2000e–3(a)). To satisfy the "opposition clause," a plaintiff need not prove that the employer's practices were actually unlawful, but only that he had "a reasonable belief that the

employer was engaged in unlawful employment practices." *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit A Sept. 1981). But a showing of subjective good faith alone is insufficient. *Harvey*, 961 F. Supp. at 1032.

Here, Plaintiff relies on the opposition clause, and cites three categories of complaints he made. First, he alleges that in 2015 he opposed and complained about the disparate pay between male and female employees. Doc. 12, Am. Compl., ¶¶ 4.2–4.3. Second, he alleges that throughout his employment, he repeatedly complained to supervisors about Bennett, the female supervisor who would make fun of his baldness in front of employees and inmates. *Id.* ¶ 5.44. Third, he also alleges that he complained about his coworker Berend's propensity to discuss sexual matters in front of him and to call her alleged paramour—their boss—during work hours. *Id.* ¶ 5.45.

While the Court does not foreclose the possibility that Plaintiff may rely on any one or all of these complaints to satisfy the first element, the Court focuses on the third set of complaints, which rely on Plaintiff's assumption that the sexual favoritism engaged in was an unlawful employment practice. At this stage, the Court assumes that this is an objectively reasonable belief, especially given that Plaintiff is not an attorney and that in some instances favoritism can give rise to a Title VII hostile-work-environment claim.[8]

Plaintiff has also met his burden at this stage as to the second element: that Plaintiff suffered an adverse employment action. An adverse employment action in the retaliation context is not

---

[8] The Court acknowledges Defendant's citation to a district court that rejected a plaintiff's argument that it was reasonable to believe that favoritism between a supervisor and his paramour could constitute an unlawful employment practice for a Title VII claim. *Harvey*, 961 F. Supp. at 1033. But that case was decided on summary judgment, after the plaintiff had the opportunity to explain why her belief was reasonable. In addition, *Harvey* was decided over three decades ago—the Court is unwilling to conclude at this stage that what constitutes a reasonable belief in this area has not shifted since that decision.

limited to "ultimate employment decisions" like hiring, promoting, and compensating, but instead includes actions that "might dissuade a reasonable worker from making a charge of discrimination or sexual harassment." *Wesley v. Yellow Transp., Inc.*, 2008 WL 294526, at *15–16 (N.D. Tex. Feb. 4, 2008) (citations omitted) (describing the "material adverse standard" used in retaliation claims). As discussed, the adverse employment action must have occurred within the 300-day limitations period. The only action that Plaintiff has alleged that qualifies is when—in May 2017—Plaintiff was demoted to "shift duty" with an associated reduction in pay and loss of seniority. Doc. 12, Am. Compl., ¶¶ 4.8–4.14. This is an action that might dissuade a reasonable worker from making a charge of discrimination or sexual harassment.

Plaintiff has also met his burden on the third element—that a causal connection exists between the protected activity and the adverse employment action. Evidence for a causal connection includes: temporal proximity between a protected act and adverse employment action; an employment record that does not support the adverse action; and an employer's departure from typical policies and procedures. *Blasingame v. Eli Lilly & Co.*, 2013 WL 5707324, at * 15 (S.D. Tex. Oct. 18, 2013). Temporal proximity alone may suffice when the acts are separated by weeks, but a gap of five months is not sufficient without other evidence of retaliation. *Id.* (citing, inter alia, *Feist v. La., Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d 450, 454 (5th Cir. 2013)). Here, Plaintiff alleges he was demoted to shift duty approximately one year after some of his complaints about Berend. Doc. 12, Am. Compl., ¶¶ 4.8, 4.21. While this is too long of a gap to be sufficient without other evidence of retaliation, Plaintiff has alleged that Defendant failed to follow its usual policies in reassigning him to shift duty. *See id.* ¶¶ 4.19–4.21. He also alleges that his employment record did not warrant such actions, as he had not received any disciplinary write-ups in the past three years.

*Id.* ¶ 4.19. The Court finds that these allegations are sufficient to satisfy Plaintiff's burden at this stage of the proceedings to show a causal connection between the protected activity and adverse employment action. Thus, the Court **DENIES** Defendant's motion to dismiss Plaintiff's retaliation claim.

C.  *Title VII Gender Discrimination (count 1) and State-Law Wrongful Termination (count 4).*

As discussed above, because both of the remaining claims involve Plaintiff's allegations of constructive discharge, the Court considers count 1 (Title VII gender discrimination) and count 4 (state-law wrongful termination) together. *See* Doc. 15, Pl.'s Resp., 13–17 (discussing both claims but relying only on cases discussing federal constructive-discharge claims). The Court considers the Title VII framework first.

To assert a claim of gender discrimination under Title VII, a plaintiff must demonstrate that: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) after his adverse employment action, he was replaced by someone not a member of the protected class or that others similarly situated and outside of the protected class were more favorably treated. *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir. 1999). Here the first two elements are uncontested. As for the third element, "ultimate employment decisions, such as hiring, granting leave, discharging, promoting, and compensation, qualify as adverse employment actions for a disparate treatment action based on race and/or national origin, and/or gender." *Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 885 (S.D. Tex. 2010).

In this case, Plaintiff alleges that the adverse employment action was constructive discharge—*i.e.*, when Defendant made working conditions so intolerable that Plaintiff quit in May 2017. Doc. 15, Pl.'s Resp., 14–15 (referencing the amended complaint). To establish constructive

discharge, a plaintiff must show the "working conditions were so intolerable that a reasonable employee would feel compelled to resign." *Lauderdale v. Tex. Dep't of Criminal Justice, Inst'l Div.*, 512 F.3d 157, 167 (5th Cir. 2007) (quoting *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)). Whether an employee was constructively discharged depends on the following factors:

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status].

*Donaldson*, 335 F. App'x at 501 (5th Cir. 2009) (quoting *Lauderdale*, 512 F.3d at 167).

In the context of constructive-discharge cases, when possible, a reasonable employee would and should attack unlawful discrimination within the context of existing employment relationships, such as pursuing an internal grievance process or filing an EEOC complaint, instead of immediately resigning. *Boze v. Branstetter*, 912 F.2d 801, 805 (5th Cir. 1990). And as Defendant notes, the Fifth Circuit has also stated that in general, constructive discharge requires a greater degree of harassment than that sufficient for a hostile-work-environment claim. Doc. 6, Def.'s Orig. Mot., 18 (citing *Brown*, 237 F.3d at 566 and *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244 (1994) (assuming without deciding that the Fifth Circuit had correctly decided this issue)); *Lauderdale*, 512 F.3d at 167. This general proposition—which would require the Court to dismiss Plaintiff's claims based on constructive discharge—warrants additional discussion.

The court in *Landgraf* stated that "[t]o prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile work environment." 968 F.2d at 430. A number of Fifth Circuit opinions have followed this general rule and dismissed constructive-discharge claims upon a showing that recovery under a

hostile-work-environment theory was not appropriate. *See e.g., Weller v. Citation Oil & Gas Corp.*, 84 F.3d 191, 195 n.7 (5th Cir. 1996) ("Because [plaintiff] failed to present sufficient evidence to support her hostile work environment claim, her constructive discharge claim necessarily fails as well."). But the Fifth Circuit has also stated in an unpublished opinion that this does not mean that anytime a hostile-work-environment claim fails that a constructive-discharge claim fails as well. *Irvine v. El Paso Healthcare Sys.*, 250 F.3d 744, at *5 n.21 (5th Cir. 2001) (per curiam) (unpublished). Indeed, many of the cases that apply this rule do so only when the plaintiff failed to show that constructive discharge was based on anything more than sexual harassment allegations, such as a demotion or reduction in salary or job responsibilities. *See, e.g., Lauderdale*, 512 F.3d at 167 ("no evidence of demotion, reduction in salary or responsibilities, reassignment, or altered terms of employment"); *Brown*, 237 F.3d at 566 (substantially similar); *Vallecillo v. U.S. Dept. of Hous. & Urban Dev.*, 155 F. App'x 764, 764, 768 (5th Cir. 2005) (affirming the summary-judgment dismissal of a constructive-discharge claim that was "an aggravated case of hostile work environment" when the plaintiff had no evidence of a demotion or reduction in pay and the hostile-work-environment claim was also dismissed). However, this Court has found no binding precedent that applies *Landgraf* and related cases in this manner. Thus, having dismissed Plaintiff's hostile-work-environment claim, the Court is bound to dismiss his claim based on constructive discharge as well.

Thus, for the aforementioned reasons, the Court **GRANTS** Defendant's motion to dismiss as to Plaintiff's gender-discrimination claim. Because the wrongful-termination claim is similar, the Court also **GRANTS** Defendant's motion to dismiss as to Plaintiff's wrongful-termination claim.

D. *Leave to Amend Not Granted*

Courts routinely grant plaintiffs leave to amend their pleadings at least once. This has already

happened in this case. Plaintiff's amended complaint was substantially similar to his original complaint, and there is no indication that further amendments would cure the defects identified herein. Thus, the claims dismissed above are dismissed with prejudice.

## IV.

## CONCLUSION

For the above-stated reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's Second Motion to Dismiss (Doc. 13). Therefore, the Court **DISMISSES with prejudice** Plaintiff's claims against Defendant for hostile work environment, gender discrimination, and wrongful discharge. Plaintiff may proceed with his remaining claims; the case will now proceed to a scheduling order.

SO **ORDERED.**

**SIGNED: June 18, 2019.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE